UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| N.P., by and through his Parents, C.P. and D. P., and C.P. and D. P., individually,<br><br>Plaintiffs,<br><br>v.<br><br>PLEASANT VALLEY SCHOOL DISTRICT,<br><br>Defendant. | CIVIL ACTION NO. 3:22-cv-00843<br><br>(SAPORITO, M.J.) |

## MEMORANDUM

A special education hearing officer denied claims for compensatory education and for prospective placement at Shrub Oak International School made by the parents of N.P., a student with autism, intellectual disability, other health impairment, and speech or language impairment. The parents asserted that the defendant, Pleasant Valley School District (the "District"), denied N.P. a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The District contends that it provided N.P. with FAPE by offering Individualized Education Programs ("IEP") that were reasonably calculated to provide meaningful education progress

considering N.P.'s particular circumstances. The hearing officer conducted five days of virtual hearings before she issued her decision on April 25, 2022. The parents filed a civil action for judicial review of the hearing officer's decision in this court on May 27, 2022. The plaintiff's Rule 12(c) motion for judgment on the record is before us for disposition. For the reasons set forth herein, we will affirm the hearing officer's decision.

I. *Statement of Facts*[1]

At the time of the filing of the complaint, N.P. was 20 years old and was identified as one in need of specially designed instruction under the primary disability category of Autism, secondary disability category of Intellectual Disability, Tertiary disability category of Other Health Impairment, and Quaternary disability category of Speech or Language Impairment. N.P. has a full-scale IQ of 40, a general disability index score of 44, and has significant and complex behavioral needs. N.P. engages in physical aggression, self-injurious behaviors, destruction of property, task refusal, difficulty with transitioning ritualistic stereotypy, eloping, yelling, crying, and occasional incontinence.

---

[1] The facts are taken primarily from the hearing officer's decision.

On January 9, 2020, N.P. was enrolled in a non-residential treatment facility associated with Behavioral Health Associates, Inc. The facility focused on a combination of therapeutics and academics, including a program for those dually diagnosed with Autism and Intellectual Disabilities, and a program for students who have enhanced behavioral needs. The facility accommodated approximately 24 students. The facility uses TACT-II (Therapeutic Aggression Control Techniques – 2), a process primarily designed to de-escalate and then physically manage students who have become unsafe either to themselves or to others. The facility uses other techniques such as response, interruption, and redirection to address students automatically reinforcing behaviors; match stimulation; and a sensory room.

Between the time N.P. was admitted to the facility and the time of the first hearing, the number of times N.P. needed to be restrained increased. During this time period, N.P. needed to be physically restrained 21 times. Because of N.P.'s size and strength, several staff members were needed to safely restrain him, some of whom required medical care for injuries in the attempts to restrain him.

N.P.'s IEP team held several revision meetings after he was placed

at the facility because of severe aggression and self-injurious behavior. In late February 2020, a progress report indicated that N.P. was adjusting to the new classroom despite some difficulties with bumping into things, pacing, eloping, and falling asleep. However, his intense negative behaviors had declined and positive interactions with staff were increasing. On March 2, 2020, the IEP team met again to discuss alternative placements for N.P., including in-state residential treatment facilities, and the parents secured a supports broker to assist in the search for an alternative placement. Many in-state alternatives were considered, but N.P. was not accepted because of his age, severe behaviors, or COVID-19 restrictions. On December 8, 2020, upon review of recommendations from various doctors and a psychiatric evaluation, the IEP team concluded that there was a medical necessity for N.P.'s placement at a residential treatment facility.

Thereafter, the team sent N.P. to an intensive outpatient behavioral program at an out-of-state institute from February 1–19, 2021, which was ineffective and made things worse. In attempt to stabilize N.P., the parents then placed him in an in-patient program at a special hospital in Connecticut for six weeks, but all gains were short-lived. There, an

evaluating doctor recommended that the necessary elements of a placement for N.P. should be 1:1 support 24 hours per day and respite for the parents, together with medication reassessment and a return to a treatment facility or partial hospitalization once N.P.'s behaviors were stabilized.

As a result of COVID-19, N.P. did not receive programming from the middle of March 2020 until the 2021–2022 school year. As a result, N.P. applied for and will receive a Department of Education offer of an additional year of education, until age 22.

N.P.'s parents have requested prospective placement at Shrub Oak International School, located in Mohegan Lake, New York, a private residential school and day school. Shrub Oak, which is accredited by the State of Washington, but not the State of New York, works with students on the autism spectrum that also have co-occurring conditions including intellectual disability, behavioral challenges, speech and language impairments, and medical or psychiatric concerns. N.P. was accepted into the "Founder's Program" at Shrub Oak, which focuses on engagement and regulation activities and integration activities. A family nurse practitioner is on duty 24 hours every day along with a mental health

team consisting of school psychologists, clinical psychologists, mental health clinicians, and board-certified behavioral analysts. The program includes adapted physical education, functional communication, and social skills.

## II. *Legal Standards*

This court has jurisdiction to review the decision of a state hearing officer under 20 U.S.C. § 1415(i). In reviewing the administrative decision in IDEA cases, district courts "are to give due weight to the factual findings of the ALJ." *S.H. ex rel. I.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 269 (3d Cir. 2003). The district court is required to conduct a "modified de novo" review of the hearing officer's decision, considering the ALJ's factual findings to be prima facie correct. *Id.* at 270; *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (noting that the court "must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion"). At no time may the court substitute its own notions of sound educational policy for those of the school authorities. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

### III. Discussion

"A FAPE is an educational instruction specially designed to meet the unique needs of a child with a disability, coupled with any additional related services that are required to assist a child with a disability to benefit from that instruction.'" *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.,* 806 F. Supp.2d 806, 813 (E.D. Pa. 2011) (quoting *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 524 (2007)) (cleaned up).

An Individualized Education Program (IEP) is a written statement serving as the primary vehicle for providing students with the required FAPE. *S.H.*, 336 F. 3d at 264.

> An IEP is a written statement developed for each child that must include several elements. It must include a statement of the child's current level of performance, and how her disability affects her performance. It must set measurable annual goals relating both to progress in the general curriculum and additional educational needs arising from her disability. The IEP must detail those special education services and supplementary aids that the school will provide, explain how they will contribute toward meeting the annual goals, how they will allow the child to progress in both the general curriculum and participate in extracurricular activities, and describe how the child will interact with disabled and nondisabled children. In measuring the child's progress, the

7

> IEP must explain whether standard student assessments will be used. If not, the IEP must explain why not and how the school will assess the child.

*Id.* (citing 20 U.S.C. § 1414(d)(1)(A)) (citations omitted). The issue of whether an IEP is appropriate is a question of fact. *D.S. ex rel. D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).

The IDEA does not require a FAPE to be a perfect or ideal education. Congress's purpose in enacting the IDEA was to "open the door of public education to handicapped children on appropriate terms" more than it was to "guarantee any particular level of education once inside." *Rowley,* 458 U.S. at 192. To satisfy its duty to provide a qualifying student with a FAPE, a school district must develop an IEP that responds to the student's identified educational needs by identifying the student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching those goals. *D.S.,* 602 F.3d at 557. Thus, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). As *Endrew F.* further explained:

> The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal.

*Id.* (citations omitted).

Here, the hearing officer found that the IEPs appropriately conformed with the FAPE requirements as the District developed IEPs that were reasonably calculated to enable N.P. to receive meaningful educational benefit based on his unique needs. The hearing officer noted that there were three IEPs: December 19, 2019; December 18, 2020; and December 17, 2021. All three IEPs were found to include present levels, individualized measurable goals, program modifications, specially designed instruction, transition services, and related services reasonably calculated to meet the unique needs of N.P. as required to assist him to benefit from that instruction. (Doc. 10-3 (Hr'g Officer Final Decision & Order), at 16.)

The hearing officer found that several IEP revision meetings were held in early 2020 after N.P.'s placement at the facility. On February 12,

9

2020, the IEP was revised to prioritize N.P.'s behavioral goals over functional academic goals because N.P.'s largest barrier to an improved quality of life was severe aggression and self-injurious behavior. (*Id.* at 6.) The academic goals were removed from the December 2020 IEP and reinstated in the December 2021 IEP. (*Id.*)

In a progress report dated February 28, 2020, it was indicated that N.P. had adjustments to a new classroom including difficulty with bumping into things, pacing, eloping, and falling asleep. It also included N.P.'s intense negative behaviors had declined and his positive interactions with the staff had increased. (*Id.*)

In a March 2, 2020, team meeting, alternative placements for N.P. were discussed including in-state, residential treatment facilities. N.P. was not accepted into those facilities because of his age, severe behaviors, or COVID-19 restrictions. (*Id.*)

The IEP team met again on December 8, 2020 and reviewed the recommendations of various doctors and psychiatric evaluation. The team concluded that there was a medical necessity for N.P.'s placement at a residential treatment facility. (*Id.* at 6–7.) The team agreed to send N.P. to an intensive outpatient behavioral program out-of-state from

February 1–19, 2021. His placement at that facility was not effective in that problem behaviors were reinforced resulting in increased self-injurious behaviors and aggression toward staff. (*Id.* at 7.) A progress report dated February 25, 2021, by the facility noted that following N.P.'s return from the placement at an outpatient institute, he was following a schedule, routine, and transitions to new locations and activities when prompted. Also, N.P. completed small tasks with staff assistance and frequent breaks. (*Id.*)

From March 26 through May 7, 2021, N.P.'s parents placed him in an in-patient program at a special hospital in Connecticut to medically stabilize him. There is a facility progress report dated April 30, 2021, which was limited to speech and language data due to N.P.'s placement in the Connecticut hospital for part of the time period covered by the report. The progress report indicated that N.P. demonstrated progress on two of three goals related to (1) functional "how" questions by sequencing pictures; (2) functional "when" questions; and (3) assigning adjectives to pictures being shown. (*Id.* at 7–8.)

The parents requested a Connecticut doctor to conduct an evaluation of N.P., who concluded that after N.P.'s hospitalization for six

weeks the particular goal of stabilization was not reached. He further concluded that the hospitalization program was not an intensive enough environment for N.P. and that it was necessary for N.P.'s medical issues to be stabilized before looking for a long-term placement. (*Id.* at 8.)

The hearing officer noted that N.P.'s

> current IEP dated December 17, 2021[,] includes goals that involve Essentials for Living (i.e., making requests; waiting; task completion; accepting "no;" following and tolerating directions related to health and safety; accepting transitions; taking turns; sharing; completing daily living skills; and reducing problem behaviors). The Parents reported that, following high school, [N.P.] will likely be placed in Adult Day Services and live in a group home. The current IEP includes functional academic goals (e.g., grammar; writing practice; adapted reading program; and functional math) and goal-specific Program Modifications and Specially Designed Instruction (SDI), Occupational Therapy, Speech and Language Therapy, Special Transportation, and Extended School Year (ESY).

(*Id.* at 9 (citations omitted).)

N.P.'s parents rely upon *New Milford Board of Education v. C.R. ex rel. T.R.*, 431 Fed App'x 157 (3d Cir. 2011), in support of their position that the hearing officer's decision should be reversed. In *New Milford*, a student and his parents sought reimbursement for after-school

12

instruction that had been excluded from the student's IEP. The testimony at an administrative hearing indicated that the student exhibited aggressive behaviors, such as shoving and making inappropriate noises. *Id.* at 159. The student's parents contended that he became aggressive when frustrated with an academic task or when he had trouble communicating, and that he would often act out in this manner to avoid tasks set for him at school. *Id.* Both parties agreed that these behaviors interfered with his ability to participate in the established IEPs but disagreed to what extent they interfered. *Id.* Ultimately, the ALJ in *New Milford* found the reports and observations by the student's witnesses to be credible and the testimony of the board's primary witnesses not credible, leading the ALJ to find that an after-school program was required to provide the student with a FAPE. *Id.* The district court and the Third Circuit each affirmed the ALJ's decision in turn. *Id.* at 159, 161.

The posture of the case before us is distinctly different from that presented in *New Milford*. Here, the hearing officer found "[e]ach of the witnesses to be candid, credible[,] and convincing," and that each "testif[ied] to the best of their ability and recollection concerning the facts

13

necessary to resolve the issues presented." (Doc. 10-3, at 13.) Based on this testimony, the hearing officer specifically found that "the parties have worked tirelessly to provide the best education and support services to meet this Student's unique and substantial needs." (*Id.* at 17–18.) She further found that "[a]ll of the parties have worked relentlessly to find an ideal placement for the Student during unusual times. Even during normal times, the Student's age and problematic behaviors would make it difficult to identify a residential placement that would admit the Student." (*Id.* at 18.) Ultimately, the hearing officer in this case, based on the evidence and testimony presented, found that "[a]t all times, the District has provided IEPs that were reasonably calculated to meet the unique and substantial needs of the Student required to assist them in benefitting from their instruction," and thus "the Parents have not demonstrated by a preponderance of the evidence that the District denied a FAPE to the Student." (*Id.*)[2]

As noted above, we are required to give due weight to the hearing

---

[2] We note that the hearing officer also recognized the parents' dedication, love, and attention to him; that they built a strong support system for him; that they have been willing to try the IEP team's suggestions; and that they have done their best to find an appropriate placement and services to stabilize N.P. to improve his capacity to benefit educationally. (Doc. 10-3, at 17.)

officer's factual findings. *S.H.*, 336 F.3d at 269. We must accept the hearing officer's credibility determinations based on live testimony unless non-testimonial extrinsic evidence in the record justifies a contrary conclusion. *D.K.*, 696 F.3d at 243. We are required to consider the hearing officer's factual findings as prima facie correct. *D.S.*, 602 F.3d at 564.

The plaintiffs have failed to cite any non-testimonial evidence to justify rejecting the hearing officer's credibility determinations or her finding that the District offered IEPs that were reasonably calculated to provide meaningful education progress considering N.P.'s particular circumstances. Viewing the administrative record and the hearing officer's finding with the appropriate deference, we find that, during the relevant time period, the District consistently monitored, documented, and responded to his individual educational needs, and that the IEPs offered by the District, as modified, were reasonably calculated to enable N.P. to make appropriate progress considering his circumstances. Accordingly, we find the District did not deny a FAPE to N.P.

In the absence of a substantive denial of a FAPE to N.P., the remedies of a compensatory education or prospective placement are

unwarranted. *See D.K.*, 696 F.3d at 252.

Accordingly, the hearing officer's decision will be affirmed.

An appropriate order follows.


Dated: September 30, 2023          ***s/Joseph F. Saporito, Jr.***
                                                         JOSEPH F. SAPORITO, JR.
                                                         United States Magistrate Judge